## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SARAH FOLKS, o.b.o. | : | |
| JIMMIE L. FOLKS, JR., | : | Civil No. 1:22-CV-1803 |
| Deceased, | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | (Magistrate Judge Carlson) |
| | : | |
| FRANK BISIGNANO,[1] | : | |
| Commissioner of Social Security, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

### I.    Introduction

This case is striking in a number of respects. At the outset, due to the protracted nature of the litigation in this case, the nature of the claimant and the claim has changed significantly since its inception. On this score, the claimant in this case, Jimmie Lee Folks, applied for disability benefits over six years ago, on April 16, 2019, alleging an onset of his disability in January of that year due to both physical and mental impairments. During the pendency of this claim, Jimmie Folks, who

---

[1] Frank Bisignano became the Commissioner of Social Security on May 6, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Frank Bisignano should be substituted as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

lived a short and tragic life, passed away and his claim is now being advanced by his widow, Sarah Folks. Given the death of her Ms. Folks pursues a relatively short period of disability benefits on behalf of her late husband.

Equally striking in this case is the nature with which the administrative law judge (ALJ) and the Commissioner have characterized Folks' severe mental illness. It is without question that Jimmie Folks suffered from an array of impairments, including post-traumatic stress disorder (PTSD), bipolar disorder, anxiety, and depression. He spent much of his young life incarcerated, a fact which he acknowledged was both caused by, and exacerbated, his mental illness.[2] He testified that he had been "institutionalized," and his psychological impairments frequently caused him to act irrationally and impulsively, become aggressive, and be unable to interact appropriately with others, resulting in losing over a dozen jobs due to conflicts with supervisors and coworkers. Folks' testimony was also reinforced by every medical expert who treated him, each opining he would have marked to extreme limitations in his ability to interact appropriately with others in a workplace setting. In addition to his difficulties interacting with others, Folks' bipolar disorder manifested in episodes of mania followed by depressive episodes. In fact, Folks

---

[2] His first arrest was in 1996 when he was only eleven years old, and he testified to being locked up in the juvenile system off and on since he was thirteen. (Tr. 863).

attempted suicide in September 2020 during the relevant disability period, the most severe manifestation of mental illness imaginable.

These mental health struggles, which we summarize below, are myriad and well-documented. Nonetheless, despite the overwhelming evidence of Folks' serious psychological symptoms and limitations, the ALJ not only mischaracterized evidence of these limitations, including downplaying a suicide attempt during the relevant period,[3] but also wholly ignored relevant evidence of this erratic behavior and discredited the opinions of every examining physician that Folks was markedly limited in interacting with supervisors, a limitation that would preclude him from work, in favor of the outlier opinion of a non-treating source. On the unique facts of this case, this cascade of errors on the part of the ALJ requires remand.

In this case, we balance the limited scope of our substantive review when considering Social Security appeals, which requires the ALJ's decision only be supported by substantial evidence which "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019), with the clear mandate under the regulations

---

[3] We are also not persuaded by the Commissioner's attempt to minimize Folks' suicide attempt as "one brief exacerbation in September 2020 requiring a three-day hospitalization." (Doc. 33, at 2). In fact, this characterization only further highlighted the ALJ's inadequate treatment of Folks' severe symptoms.

3

that an ALJ consider "*all* the relevant medical and other evidence" that was available to the ALJ. 20 C.F.R. § 404.1545(a)(3) (emphasis added). This means an ALJ may not cherry pick the record and may not simply rely on the "pieces of the examination reports that supported [his] determination," at the exclusion of other evidence. Morales v. Apfel, 225 F.3d 310, 318 (3d Cir. 2000); see also Smith v. Berryhill, No. CV 17-2661, 2018 WL 7048069, at *9 (E.D. Pa. Nov. 27, 2018), report and recommendation adopted, No. CV 17-2661, 2019 WL 199942 (E.D. Pa. Jan. 11, 2019) (citing Rios v. Comm'r of Soc. Sec., 444 F. App'x 532, 535 (3d Cir. 2011)) ("an ALJ is not permitted to 'cherry-pick[ ] or ignor[e] medical assessments that run counter to her finding.'"). Here, we find that the ALJ ignored relevant evidence and mischaracterized the record of Folks' mental impairments in order to deny this claim. This was error. Therefore, we will order this case remanded for further consideration by the Commissioner.

## II.    **Statement of Facts and of the Case**

### A. **Introduction**

On April 16, 2019, Folks filed applications for disability and supplemental security benefits under Titles II and XVI, alleging disability beginning January 1, 2019. (Tr. 13). In this application, Folks alleged that he was disabled due to an array of physical and mental impairments, including various musculoskeletal issues,

attention deficit hyperactivity disorder (ADHD), bipolar, depression, anxiety, impulse controls, and "disruptive." (Tr. 100). Folks was born on October 4, 1985, and was thirty-three years old at the time of the alleged onset of his disability, making him a younger worker under the Commissioner's regulations. (Id.) He completed seventh grade in a special education program for students with a learning disability. (Tr. 861). According to Folks, "I've seen a lot of darkness in my life. And I have a lot of demons and I didn't grow up the right way. I ran away from home when I was 13 and never came back. I was emotionally abused by my mother, and I was physically abused by the juvenile system." (Tr. 41).

Folks described a series of jobs in mostly the construction and labor industries – from over a dozen of which, as he detailed at the hearing, he was either fired or quit due to interpersonal conflicts with supervisors and coworkers. (Tr. 61-74). He testified, "I always clash with them and I clash with police . . . and I clash with bosses/supervisors, anybody that tries to tell me what to do with myself or how to do something, you know what I mean, I don't . . . I don't get along good with." (Tr. 80). He described being uncomfortable, anxious, irritated, on edge and ready to snap at work due to his mental health. (Tr. 81).

### B. **Folks' Mental Impairments**

Folks reported experiencing psychiatric symptoms beginning in 1990, when he was only five years old. (Tr. 861). He testified at the hearing that he had been receiving mental health treatment consistently since he was twenty-one, with the only exceptions being when he had lapses in insurance due to unstable work. (Tr. 86-87). He also testified to consistently taking his medications, stating that they have helped him live a normal daily life in many ways but that him being "stable" meant keeping him out of jail and in his kids' lives but that he was still "very antisocial." (Tr. 89-91).

As far as the longitudinal record of his mental impairments prior to the alleged onset date, it was noted that received outpatient therapy and medication management for twelve years at Scranton Counseling before he had a psychiatric hospitalization in 2017 for bipolar and began treatment at the Aaron Center. (Tr. 861). That same year, Folks underwent a mental status evaluation with Dr. John Laurence Miller. (Tr. 861-65). At this examination Folks reported significant symptoms of depression, anxiety, and mania. Due to his bipolar disorder, Folks experienced depressive episodes followed by periods of mania. His depressive episodes included dysphoric moods, crying spells, feelings of hopelessness, diminished self-esteem, social withdrawal, irritability causing him to smash things and sometimes hurt people, and

6

occasional fatigue and loss of energy. He reported suicidal and homicidal ideation a month prior. (Tr. 862). When he was manic, he reported inflated self-esteem, grandiosity, more talkative pressured speech, decreased need for sleep that could allow him to stay awake reportedly for seven days in a row, flights of ideas, elevated and expansive moods, increased goal directed activity such as cleaning, and excessive involvement in pleasurable activities such as driving fast, spending excessively, and giving things away. (Id.) As far as his anxiety, Folks reported excessive apprehension, worry and fearfulness of groups of people and weekly panic attacks triggered by groups of strangers. (Id.) He also reported auditory and visual hallucinations including hearing his mother calling his name or his children calling "daddy help me" and paranoid ideation causing him to trust nobody. (Id.) Dr. Miller's examination of Folks revealed rapid pressured speech, agitated affect, and dysthymic mood but coherent thought process, intact orientation, and average intellectual functioning. (Tr. 863-64). His attention and concentration were impaired due to emotional distress secondary to depression. (Id.) Folks reported he was able to perform some activities of daily living but stated he gets along poorly with his family other than his wife and has no hobbies. (Tr. 864).

Following the alleged onset date of January 1, 2019, Folks was interviewed by a Social Security field officer to collect more information on his claim. That

officer reported that Folks was extremely hostile and very rude and on edge during the interview. (Tr. 409). The field officer stated that Folks was very difficult to talk to, kept redirecting the conversation, would not allow the officer to ask any questions to develop an earlier onset date, and told the officer he wanted to be rushed through in order to leave as quickly as possible but was in the office for seventy minutes because he would not stop talking about irrelevant information. (Id.) The field officer also stated that Folks reported he had been kicked out of multiple doctor's offices and the Aaron Center, where he was receiving mental health treatment at the time, made him sign a waiver that he would not threaten anyone and be on his best behavior while in the facility. (Id.)

The field officer's statements were reiterated by the State agency psychological consultants who considered Folks' application at the initial level, Dr. Franks, who noted, "FO noted claimant was rude and hostile and reported being kicked out of multiple doctor's offices." (Tr. 113).

In 2019 Folks began mental health treatment at Friendship House at which time he seemed to be improving. The ALJ focuses on notes from this period, including an October 2019 note stating:

> He is significantly improved from his intake which was three months ago. His speech is still pressured, but not so much as it was at that time. His focus is better. The Adderall is also having that effect on him. His sleep is better. He is back to work. He has fewer outbursts.

8

(Tr. 873). Nonethless, it was still noted he was having "a lot of difficulty with the fact that his wife had issues as one would expect with his illness." (Id.) It was also noted he was able to work which the counselor stated was "phenomenal" but "probably because they are willing to put up with him where he works." (Tr. 874). In December 2019 it was also noted he had stabilized and had "significantly improved," but also noted he still had PTSD related anxiety. (Tr. 872).

Folks also underwent a psychological evaluation in December 2019 with Dr. John Reinhardt. (Tr. 774-76). Dr. Reinhardt concluded that Folks had borderline intellectual functioning with a full-scale IQ of 79. (Tr. 776). Folks was unable to complete the interview the first time and had to return for a second interview. Dr. Reinhardt stated: "At our first meeting [Jimmy] was pleasant but extremely anxious and had difficulty sitting still. He reported that he would have to leave the interview if it were not over quickly. Consequently, the interview was cut short." (Tr. 775). At the second interview he sat through the entire evaluation and was less nervous. (Id.) He was fidgety and distractible despite his medication but concentrated well with no evidence of distortion of thought or perception or the presence of a thought disorder. (Id.) The doctor noted his "impulse control was present, although clearly limited." (Id.) Dr. Reinhardt also noted that "in the past, his ability to maintain employment has been impaired by severe anxiety resulting in angry outbursts." (Tr. 776).

Then, on March 22, 2020, Folks was in a serious motorcycle accident in which he suffered "severe life changing injuries to his left shoulder and left knee," (Tr. 1009), along with other injuries. (Tr. 1014). The hospital noted he was "belligerent, confrontational, and agitated on admission." (Tr. 1051). Folks underwent surgery to stabilize his left femur and tibia with an implant and to repair the severe injury to his left shoulder, which was ultimately unsuccessful. (Tr. 1010-11). His care team was considering whether another surgery would be necessary when, the next day, Folks abruptly discharged himself from the hospital. Discharge notes stated:

> Called to floor by nursing stating that patient wanted to leave AMA. Went to bedside to talk to patient. Patient yelling that he was going outside to smoke a cigarette, explained to patient that this was not allowed, offered patient nicotine patch and chewing gum, but patient refused. Patient continued to state that he was going to leave AMA, continued to yell and curse at staff. Attempted to talk to patient and explain that he needed to remain in the hospital for continued treatment with surgical operations, pain control, and PT/OT. Also explained to patient that due to fractures and recent surgical operation, patient had limited mobility. Unsuccessful. Patient continued to yell and curse at staff and became increasingly agitated. Code grey called. Security, nursing supervisor, nursing manager, nursing leaders present, all attempted to talk to patient. Patient left hospital against medical advice, papers signed.

(Tr. 1014). Hospital notes state that Folks was not stable for discharge but Folks had a friend pick him up. (Tr. 1051). The following day he returned to the hospital asking

10

to be readmitted for pain control and for reevaluation. (Tr. 1051). Symptom review noted he was nervous/anxious and positive for behavioral problems. (Tr. 1052).

Six months later, on September 15, 2020, Folks attempted suicide. His wife told his medical providers that he had been depressed for a few months prior and that his depression had been getting progressively worse over the prior few days, but that he refused to seek medical interventions stating, "he would rather die before going to the 7th floor [psychiatric floor]." (Tr. 1112). Folks stated that he had not been taking his medications for two to three days prior to his suicide attempt and had started to drink heavily. (Tr. 1148). He reported he had been "super energetic and had grandiose feeling like God" over the last week prior to his suicide attempt. (Id.) The day he attempted suicide, Ms. Folks stated they had been separated for a few days and had gotten in a verbal fight that morning. (Tr. 1112, 1119). Folks later called his sister stating he was going to kill himself and showed himself taking pills with alcohol. After his sister called 911, police/EMS found him in his car unresponsive with an empty bottle of Ativan. (Id.) He was intubated and remained unresponsive until the next day. (Id.) Folks was transferred to the psychiatric unit days later where he remained until he was discharged on September 24, 2020. (Tr. 1142). Discharge notes stated that he was stable to be discharged at home, but also noted that, "upon arrival to the D7 unit his speech was pressured and made

11

threatening statements that he will be violent if he does not get discharged in 1-2 days." (Tr. 1174).

### C. **The Medical Opinion Evidence**

It was against this medical backdrop, showing Folks experienced short periods of stability but significant swings in his psychological symptoms due to bipolar disorder, including a suicide attempt, that several experts opined on his ability to perform work-related activity despite these symptoms. Every source that examined the plaintiff concluded he would have marked to extreme limitations in interacting with others. The only opinion which concluded Folks was only moderately limited in this arena was that of Dr. Karen Plowman, the source whose opinion the ALJ found most persuasive but a source who had never met or examined the plaintiff.

On this score, on May 20, 2017, Folks was examined by consultative examiner John Laurence Miller, Ph.D. Following his examination of the plaintiff, Dr. Miller opined he had marked limitations in carrying out complex instructions and marked limitations in interacting appropriately with the public, interacting appropriately with supervisors, and interacting appropriately with coworkers, noting a bad temper, history of homicidal ideation, anxiety, and depression. (Tr. 867).

One of Folks' treating providers, Carlene Spitzer, PA-C; MSPAS, also opined that Folks had marked to extreme limitations in interacting with others, including

12

marked limitations in cooperating with others, responding to requests, suggestions, criticism, correction and challenges, and keeping interactions free of excessive irritability, sensitivity, argumentativeness, and suspiciousness, and that he was extremely limited in handling conflict with others. (Tr. 748). She also noted marked and extreme limitations in several other arenas, including extreme limitations in ignoring or avoiding distractions while working, and marked limitations in changing activities or work settings without being disruptive, responding to demands, and adapting to changes. (Tr. 748-49).

A second consultative examiner, Dr. John Reinhardt, opined similarly after examining the plaintiff in January 2020. Dr. Reinhardt opined that, despite Folks' borderline IQ, he had only mild limitations in understanding, remembering, and applying information and no limitations in following one or two step oral instructions. (Tr. 777). Nonetheless, Dr. Reinhardt did opine that Folks had marked limitations in some areas of interacting with others including handling conflict with others, responding to requests, suggestions, criticism, correction, and challenges, and keeping social interactions free of excessive irritability, sensitivity, argumentativeness, and suspiciousness. (Tr. 778). He also noted Folks would have moderate limitations in cooperating with others, asking for help when needed, and understanding and responding to social cues. (Id.) Dr. Reinhardt also opined that

13

Folks would have moderate limitations in some areas of concentrating, persisting, and maintaining pace, and adapting and managing oneself. (Tr. 778-79).

The only outlier opinion was that of state agency psychological consultant Dr. Karen Plowman, who, on November 12, 2019, concluded that Folks had only moderate limitations in his ability to understand, remember, or apply information, interact with others, concentrate, persist, or maintain pace, and adapt or manage himself. (Tr. 127-28).[4] Specifically, Dr. Plowman found Folks was moderately limited in, among other things, interacting appropriately with the general public, accepting instructions and responding appropriately to criticism from supervisors, and getting along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 152-53). Dr. Plowman cited to records from July, August, September, and October 2019 which showed varying degrees of psychological impairment on the part of Folks. (Tr. 128). Dr. Plowman's outlier opinion, which was tendered at the early stages of the administrative process, necessarily did not take into account subsequent material medical developments, including Folks' September 2020 suicide attempt. Thus, Dr. Plowman opined on this issue without

---

[4] The other State agency psychological consultant who considered Folks' claim at the initial stage concluded there was insufficient evidence to determine whether he had limitations in any areas of mental functioning. (Tr. 113).

the benefit of knowledge that Folks' mental health symptoms would later drive him to attempted self-destruction.

## C. **The ALJ Hearing and Decision**

It was against this medical backdrop that Folks' disability claim came to be heard by the ALJ first on May 13, 2021, and again on May 17, 2021. (Tr. 34-95). Folks testified that his bipolar disorder manifests in him becoming aggressive and argumentative and that his mood and behavior is very inconsistent in that he sometimes does not sleep for six or seven days and then crashes and sleeps for two days. (Tr. 39-40). During manic episodes he reported impulsivity including spending "all my money," giving things away, and selling things. (Tr. 40). He also described periods of depression. (Tr. 41). At the hearings, Folks' attorney questioned him about a series of over a dozen jobs he had performed, and Folks testified that he had lost nearly every one due to fights and arguments with his boss or coworkers. (Tr. 70-74). He testified that, "I always clash with them and I clash with police . . . and I clash with bosses/supervisors, anybody that tries to tell me what to do with myself or how to do something, you know what I mean, I don't . . . I don't get along good with." (Tr. 80). He stated that medications have helped him live a normal daily life in many ways, staying out of jail and not making irrational decisions, but "as far as socially interacting, not at all. I'm very antisocial." (Tr. 89-91).

15

A vocational expert (VE) also testified at the hearing. The VE testified that if an individual responded inappropriately to their supervisor once a month, they would be unable to perform the duties of any job. (Tr. 52). The VE also testified that there is a zero tolerance in the workplace for an individual physically threatening their supervisor and if an individual were off task more than twenty percent of the time, including tardiness and absences, they would be precluded from the workplace. (Tr. 51-52).

Following this hearing, on June 1, 2021, the ALJ issued a decision denying Folks' application for benefits. (Tr. 10-27). In that decision, the ALJ first concluded that the plaintiff met the insured status requirements of the Social Security Act through June 30, 2021, and had not engaged in substantial gainful activity since January 1, 2019, the alleged onset date.[5] (Tr. 16). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Folks had the following severe impairments: bipolar disorder, attention-deficit hyperactivity disorder (ADHD), status-post ORIF for right tibia-fibula fracture in 2017, status-post ORIF for tibial plateau fracture and tibia and proximal fibula fracture in March 2020, left shoulder

---

[5] The ALJ acknowledged that Folks had worked at two different jobs during this time, one from August 2019 to November 2019 and another between November and December 2019 but stated the amount he earned clearly fell below SGA levels. The ALJ also acknowledged the plaintiff had lost both jobs after getting in arguments with his bosses. (Tr. 16).

hemiarthroplasty with open rotator cuff repair, open bicep tenotomy, and open removal of dislocated posterior head. (Id.)

At Step 3, the ALJ determined that these impairments did not meet or medically equal the severity of any listed impairments. (Tr. 17-19). In so concluding, the ALJ considered whether the "paragraph B" criteria, broad areas of functioning which an ALJ considers in determining the severity of mental impairments, had been met. The ALJ concluded that Folks had moderate limitations in understanding, remembering or applying information, interacting with others, concentrating, persisting or maintaining pace, and adapting or managing oneself. (Id.) The ALJ's "paragraph B" analysis relied heavily on the lack of mental examination findings in recent outpatient treatment records, Folks' activities of daily living, and the conclusions of the only non-examining expert who opined on Folks' mental limitations, Dr. Plowman. The analysis did not mention the treatment notes from his motorcycle accident or the field officer interview notes showing hostile and erratic behavior, his history of job loss due to fights with his supervisors, his suicide attempt during the relevant period, or the three examining sources who opined he would have marked to extreme limitations in interacting with others.

Between Steps 3 and 4, the ALJ fashioned a residual functional capacity ("RFC"), considering the plaintiff's limitations from her impairments, stating that:

17

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with the following additional limitations. The claimant can perform occasional push/pull with the lower extremities, occasional overhead reach with left upper extremity and occasional push/pull with the left upper extremity. The claimant can perform occasional balance, stoop, crouch, crawl, kneel, and climb but never on ladders ropes or scaffolds. The claimant is limited to frequent exposure to temperature extreme of cold, wetness, and hazards including moving machinery and unprotected heights, and limited to occasional vibrations. The claimant can do simple routine tasks, but no complex task in low stress environment with occasional decision-making and occasional changes in work setting, occasional interaction with supervisors and coworkers, but no team type setting work and no interaction with public.

(Tr. 19).

The ALJ's RFC analysis contained a three-paragraph assessment of the medical record of Folks' mental impairments which omitted much of the evidence of his impulsive and erratic behavior and significantly minimized his suicide attempt. As the ALJ summarized:

From a mental perspective, a review of the medical evidence of record reveals that the claimant has a history of mental impairments, including bipolar disorder and ADHD, which date back to 2013 (Exhibits B1F; B2F; B3F; B8F; B9F; B14F; B15F; B16F). Then, in August 2019, the record shows that the claimant began outpatient services with Friendship House after he was discharged from The Aaron Center due to noncompliance with his appointments. At that time, the claimant also had been off his medications for roughly 3 months (Exhibit B9F/1, 7). Fortunately, when returning to Friendship House in October 2019, the claimant had significantly improved from his intake, which was three months prior. The claimant still had pressured speech, but his focus was

better, he was back to work, and he was experiencing fewer outbursts (Exhibit B9F/11).

Subsequently, the record shows that the claimant presented for a psychological evaluation with John Reinhardt, Ph.D. in December 2019, at the request of his representative. There, the claimant's IQ testing resulted in borderline to low average scores and although the claimant was extremely anxious during his first interview, he remained pleasant and he was less anxious during their second meeting. Additionally, the claimant was able to sit through the interview and concentrate on tasks with little redirection, his mood was pleasant and friendly, and he easily engaged in conversation. While he was fidgety, he remained seated and while he had some distractibility, he concentrated well and there was no evidence of distortion, thought disorder, thoughts of hard to self, and, although limited, present impulse control (Exhibit B13F).

Ultimately, the record shows that the claimant continued to treat his mental impairments with Friendship House and during his December 2019 visit, the claimant was stabilized and he was back with his wife. He also noted significant improvement and there were no mental status examination findings (Exhibit B18F/4). More recently, the record does contain an emergency room visit in September 2020 for a suicide attempt after the claimant was found unresponsive (Exhibit B19F/218). Nonetheless, the claimant stabilized during his admission and he was discharged three days later (Exhibit B19F/285). Furthermore, the record does not contain any follow-up mental health treatment.

(Tr. 21-22).

The ALJ's assessment focused on the records from Friendship House at the end of 2019, stating he had improved significantly and was back at work, but ignored the fact that treatment records stated "it is probably because they are willing to put up with him where he works" and that Folks was fired shortly thereafter for getting

19

in a fight with his supervisor. The ALJ also did not mention other evidence during the same period of significant psychological symptoms of Folks' bipolar disorder that are easily discernible from the record. This evidence includes the February 2019 notes from the field office interviewer that Folks was rude, hostile, erratic, and on edge and frequently changed the direction of the conversation, statements that were reiterated by the State agency psychological consultants who considered Folks' application at the initial level and thus were undeniably before the ALJ. (Tr. 113, 409). The ALJ also made no mention of the March 2020 Geisinger records of Folks' motorcycle crash showing he yelled and cursed at staff and discharged himself from the hospital despite grave injuries.

As to the medical opinion evidence, the ALJ found the November 2019 opinion of State agency psychological consultant Dr. Plowman, the only opinion that did not find Folks had marked to extreme limitations in interacting with others, persuasive stating it was supported by and consistent with the medical evidence of record and activities of daily living, specifically outpatient treatment records noting some progress, grossly normal mental status examinations, and no follow-up treatment after "his most recent hospital admission."[6] (Tr. 23).

---

[6] This most recent hospital admission was apparently a reference to Folks' September 2020 attempted suicide. Thus, in this oblique fashion the ALJ suggested

The ALJ then rejected the opinions of treating sources Carlene Spitler and John Laurence Miller, who had opined that Folks had marked and extreme limitations in interacting with others, as outdated since they were issued prior to the alleged onset date. The ALJ did not consider the specifics of the opinion of Dr. Miller, stating it "was also considered in the claimant's prior adjudications." (Tr. 24). The ALJ did analyze the opinion of Carlene Spitler but, in addition to finding it outdated, concluded "the marked-to-extreme limitations are not consistent with or supported by the subsequent outpatient treatment records, which showed some improvement by October 2019." (Id.)

The ALJ also found the opinion of consultative examiner, Dr. Reinhardt, partially persuasive, but rejected his marked limitations in interacting with others, stating:

> [T]he marked limitations in interacting with others are not supported longitudinally and appear to be based upon the claimant's subjective complaints during Dr. Reinhardt's one-time examination. In fact, Dr. Reinhardt's own examination findings, including pleasant and friendly mood and engagement in conversation do not support such marked limitations.

(Tr. 24). The ALJ did not mention that Dr. Reinhardt's first meeting with Folks ended abruptly due to his erratic and anxious behavior. (Tr. 775).

---

that Folks' attempted suicide in some fashion bolstered this relatively benign outlier medical opinion.

Having made these findings, the ALJ concluded that Folks could not return to his past work but could perform other light exertional work in the national economy. (Tr. 25-26). Accordingly, the ALJ concluded that the plaintiff did not meet the stringent standard for disability set by the Act and denied this claim. (Id.)

This appeal followed. (Doc. 1). On appeal, Folks advances several specific claims regarding the ALJ's assessment of his mental impairments which all amount to a failure of the ALJ to consider all the evidence in the record and adequately articulate the reasons why this evidence was rejected in favor of evidence which supported the ultimate unfavorable outcome. After a review of the evidence, we agree that the ALJ's strikingly benign characterization of a mental health record which shows Folks experienced profound symptomology from his array of mental impairments resulted in an erroneous decision which directly affected the outcome of this disability determination. Therefore, we will remand this case for further consideration by the Commissioner.

III.  **Discussion**

A. **Substantial Evidence Review – the Role of this Court**

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the

record.  See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988).  Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency

23

factfinding. <u>T-Mobile South, LLC v. Roswell</u>, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." <u>Ibid.</u>; <u>see, e.g., Perales</u>, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Consolidated Edison</u>, 305 U.S. at 229, 59 S.Ct. 206. <u>See Dickinson v. Zurko</u>, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

<u>Biestek</u>, 139 S. Ct. at 1154.

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. <u>See</u> <u>Arnold v. Colvin</u>, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); <u>Burton v. Schweiker</u>, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); <u>see also</u> <u>Wright v. Sullivan</u>, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal

24

matters is plenary); Ficca, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

This principle applies with particular force to legal challenges, like the claim made here, based upon alleged inadequacies in the articulation of a claimant's mental RFC. In Hess v. Comm'r Soc. Sec., 931 F.3d 198, 212 (3d Cir. 2019), the United States Court of Appeals recently addressed the standards of articulation that apply in this setting. In Hess the court of appeals considered the question of whether an RFC which limited a claimant to simple tasks adequately addressed moderate limitations on concentration, persistence, and pace. In addressing the plaintiff's argument that the language used by the ALJ to describe the claimant's mental limitations was legally insufficient, the court of appeals rejected a *per se* rule which would require the ALJ to adhere to a particular format in conducting this analysis. Instead, framing this issue as a question of adequate articulation of the ALJ's rationale, the court held that: "as long as the ALJ offers a 'valid explanation,' a 'simple tasks' limitation is permitted after a finding that a claimant has 'moderate' difficulties in 'concentration, persistence, or pace.' " Hess v. Comm'r Soc. Sec., 931 F.3d 198, 211 (3d Cir. 2019). On this score, the appellate court indicated that an ALJ

offers a valid explanation a mental RFC when the ALJ highlights factors such as "mental status examinations and reports that revealed that [the claimant] could function effectively; opinion evidence showing that [the claimant] could do simple work; and [the claimant]'s activities of daily living, . . . ." Hess v. Comm'r Soc. Sec., 931 F.3d 198, 214 (3d Cir. 2019).

In our view, the teachings of the Hess decision are straightforward. In formulating a mental RFC the ALJ does not need to rely upon any particular form of words. Further, the adequacy of the mental RFC is not gauged in the abstract. Instead, the evaluation of a claimant's ability to undertake the mental demands of the workplace will be viewed in the factual context of the case, and a mental RFC is sufficient if it is supported by a valid explanation grounded in the evidence.

### B. Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); see also 20 C.F.R. §404.1505(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous

work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §404.1520(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §404.1520(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1). In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe

28

impairments identified by the ALJ at step two of his or her analysis.  20 C.F.R. §404.1545(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and have suggested that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a

physician is misguided." Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where a well-supported medical source has identified limitations that would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. Biller, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006); Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015). In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if

it is supported by substantial evidence. <u>Burns v. Barnhart</u>, 312 F.3d 113, 129 (3d Cir. 2002); <u>see also Metzger v. Berryhill,</u> No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), <u>report and recommendation adopted sub nom. Metzgar v. Colvin</u>, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); <u>Rathbun v. Berryhill</u>, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), <u>report and recommendation adopted</u>, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. <u>Mason</u>, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §404.1512(f); <u>Mason</u>, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory

explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-07. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 433 (3d Cir. 1999).

## C. **Legal Benchmarks for the ALJ's Assessment of Medical Opinions**

The plaintiff filed this disability application following a paradigm shift in the manner in which medical opinions were evaluated when assessing Social Security claims. Prior to March 2017, ALJs were required to follow regulations which defined medical opinions narrowly and created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy. However, in March of 2017, the Commissioner's regulations governing medical opinions changed in a number of fundamental ways. The range of opinions that ALJs were enjoined to consider were broadened substantially, and the approach to evaluating opinions was changed from a hierarchical form of review to a more holistic analysis. As one court as aptly observed:

> The regulations regarding the evaluation of medical evidence have been amended for claims filed after March 27, 2017, and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. According to the new regulations, the Commissioner "will no longer

give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." <u>Revisions to Rules Regarding the Evaluation of Medical Evidence</u> ("<u>Revisions to Rules</u>"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), <u>see</u> 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors." 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." <u>Id</u>. at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1). The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that formed the foundation of the treating source rule. <u>Revisions to Rules</u>, 82 Fed. Reg. 5844-01 at 5853.

An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." <u>Id</u>. at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." <u>Id</u>. at §§ 404.1520c(c)(2), 416.920c(c)(2).

Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the

33

persuasiveness of a medical source's opinion. Id. at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). Id. at §§ 404.1520c(b)(3), 416.920c(b)(3).

Andrew G. v. Comm'r of Soc. Sec., No. 3:19-CV-0942 (ML), 2020 WL 5848776, at *5 (N.D.N.Y. Oct. 1, 2020).

Oftentimes, as in this case, an ALJ must evaluate various medical opinions. Judicial review of this aspect of ALJ decision-making is still guided by several settled legal tenets. First, when presented with a disputed factual record, it is well-established that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). Thus, when evaluating medical opinions "the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Mason, 994 F.2d at 1066). Therefore, provided that the decision is accompanied by an adequate, articulated rationale, it is the province and the duty of the ALJ to choose which medical opinions and evidence deserve greater weight.

Further, in making this assessment of medical evidence:

An ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion. See Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015);

34

> Turner v. Colvin, 964 F. Supp. 2d 21, 29 (D.D.C. 2013) (agreeing that
> "SSR 96–2p does not prohibit the ALJ from crediting some parts of a
> treating source's opinion and rejecting other portions"); Connors v.
> Astrue, No. 10–CV–197–PB, 2011 WL 2359055, at *9 (D.N.H. June
> 10, 2011). It follows that an ALJ can give partial credit to all medical
> opinions and can formulate an RFC based on different parts from the
> different medical opinions. See e.g., Thackara v. Colvin, No. 1:14–CV–
> 00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015).

Durden v. Colvin, 191 F.Supp.3d 429, 455 (M.D. Pa. 2016). Finally, where there is

no evidence of any credible medical opinion supporting a claimant's allegations of

disability "the proposition that an ALJ must always base his RFC on a medical

opinion from a physician is misguided." Cummings, 129 F.Supp.3d at 214–15.

### D. **This Case Will Be Remanded.**

After a review of the record, we conclude that the ALJ's analysis of Folks'

mental impairments, and the limitations they caused, was flawed in several ways. At

the outset, the ALJ's consideration of the longitudinal medical record in this case

was incomplete and seemed to cherry-pick the treatment records, focusing on notes

that he was improving and ignoring glaring evidence of ongoing significant

symptoms of his impairments. On this score:

> Although the Third Circuit "do[es] not expect the ALJ to make
> reference to every relevant treatment note in a case [involving]
> voluminous medical records, [the court] do[es] expect the ALJ, as the
> factfinder, to consider and evaluate the medical evidence in the record
> consistent with his responsibilities under the regulations and case law."
> Fargnoli v. Massanari, 247 F.3d 24, 42 (3d Cir. 2001); see also Burnett

v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) ("Although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence which he rejects and his reason(s) for discounting such evidence."). Moreover, an ALJ is not permitted to "cherry-pick[ ]" or ignor[e] medical assessments that run counter to her finding." Rios v. Comm'r of Soc. Sec., 444 F. App'x 532, 535 (3d Cir. 2011) (citing Dougherty v. Barnhart, Civ. No. 05-5383, 2006 WL 2433792, at *10 n.4 (E.D. Pa. Aug. 21, 2006); Colon v. Barnhart, 424 F. Supp.2d 805, 813-14 (E.D. Pa. 2006) ); see also Schroeder v. Berryhill, Civ. No. 16-464, 2017 WL 4250057, at *17 (M.D. Pa. Sept. 5, 2017) ("The sort of evaluation, where the evaluator mentions only isolated facts that militate against the finding of disability and ignores much other evidence that points another way, amounts to a 'cherry-picking' of the record which this Court will not abide."). Similarly, "[w]hen a conflict in the evidence exists, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.' " Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) (quoting Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir. 1993) ). "The ALJ must consider all the evidence and give some reason for discounting the evidence she rejects." Id. (quoting Stewart v. Sec. of H.E.W., 714 F.2d 287, 290 (3d Cir. 1983) ).

Smith v. Berryhill, No. CV 17-2661, 2018 WL 7048069, at *9 (E.D. Pa. Nov. 27, 2018), report and recommendation adopted, No. CV 17-2661, 2019 WL 199942 (E.D. Pa. Jan. 11, 2019).

Here, because the ALJ failed to mention and discuss relevant evidence, "the court does not know whether the ALJ overlooked/ignored this evidence or rejected it, and if he rejected it, on what basis." Id. (citing Burnett, 220 F.3d at 121 ("In the absence of [an indication of which evidence the ALJ rejects and his underlying reasoning] the reviewing court cannot tell if significant probative evidence was not

credited or simply ignored")). In this case, the ALJ's RFC analysis focused on notes from the treatment records which supported her ultimate conclusion that he was only moderately limited in mental functioning, including notes from Friendship House in October and December 2019 stating his condition had improved, a "lack of any mental status examinations," and his ability to perform some activities of daily living. But the ALJ ignored significant evidence of Folks' obvious and profound psychological symptoms which manifested in erratic, irrational, and hostile behavior; evidence which is easy to find in a relatively meager administrative record. For example, the ALJ made no mention of the February 2019 social security field office interviewer form clearly noting the type of manic behavior Folks testified to having, including that he was extremely hostile, very rude, on edge, difficult to talk to, and frequently changed the direction of the conversation. The ALJ also did not mention that one day after a catastrophic motorcycle accident in which Folks suffered "severe life changing injuries to his left shoulder and left knee," (Tr. 1009), he became belligerent and discharged himself from the hospital because he wanted to smoke a cigarette.

Moreover, even the records referenced by the ALJ are strikingly mischaracterized and minimized. For example, although the Friendship House notes from 2019 state he had significantly improved from three months earlier, those same

records indicate he was still experiencing "a lot of PTSD related anxiety." Moreover, highlighting notes of brief improvement in two visits within a three-month period ignores the cyclical nature of bipolar, specifically when viewed in the context of other records at the time, which were ignored by the ALJ, showing serious manic and depressive episodes. See Schink v. Comm'r of Soc. Sec., 935 F.3d 1245, 1268 (11th Cir. 2019) (holding the episodic nature of bipolar must be recognized by the ALJ); Buck v. Colvin, 540 F. App'x 772, 773 (9th Cir. 2013) ("Given the episodic nature of bipolar disorder, short-lived improvements in functioning are consistent with the diagnosis and cannot, by themselves, constitute substantial evidence to override treating source opinions that [the plaintiff] was significantly impaired."); Bauer v. Astrue, 532 F.3d 606, 609 (7th Cir. 2008) (concluding that an ALJ's focus on treatment notes with "hopeful remarks" and functional activities of daily living in discounting the opinions of treating sources about the severity of bipolar disorder "suggests a lack of understanding of bipolar disorder").

Further, and most significantly, the ALJ's characterization of Folks' September 2020 suicide attempt as a "recent hospital admission," (Tr. 23), strikingly and callously minimizes possibly the most severe manifestation of mental impairment imaginable.

These errors are compounded by the ALJ's treatment of the medical opinion evidence, which adopted the limitations opined by the only non-examining psychological consultant and rejected the opinions of three examining sources who opined Folks would have marked to extreme limitations in interacting with others. At the outset, while the regulations have eschewed the treating source rule in favor of a more holistic approach to the assessment of medical opinion evidence, in Folks' case, the ALJ's decision to credit a non-examining source, particularly in finding he could occasionally interact with supervisors, is striking since the record demonstrates that everyone who interacted with him personally concluded he had severe limitations in this arena. But a non-examining source, looking only at the record, would be limited in assessing this aspect of the plaintiff's mental capacity.

In addition to the clear limitations in a non-examining source's assessment of Folks' mental limitations, which manifest in his interpersonal interactions, the ALJ simply declined to fully assess the opinion of consultative examiner Dr. Miller. On this score, the ALJ summarily rejected the opinion of this examining source as outdated without considering its substance. While this opinion is from 2017, prior to the alleged onset date, ALJs are empowered to "consider all evidence of record, including medical records and opinions dated prior to the alleged onset date," and may reject outdated evidence where "it was

undermined by the more 'detailed, longitudinal picture' provided by . . . later medical assessments." <u>Louis v. Comm'r Soc. Sec.</u>, 808 F. App'x 114, 120 (3d Cir. 2020) (citing <u>Pirtle v. Astrue</u>, 479 F.3d 931, 934 (8th Cir. 2007); 20 C.F.R. § 416.912; 20 C.F.R. § 404.1527(c)(2)). Here, the ALJ provided no analysis as to whether she rejected the outdated opinion of Dr. Miller due to some improvement in Folks' symptoms since that date but simply found it unpersuasive due to it taking place nearly two years prior to the alleged onset date.

In rejecting the opinion of treating source Carlene Spitzer as outdated, the ALJ did reference treatment records showing some improvement in his symptoms by October 2019. However, our view of the medical evidence, as thoroughly summarized above, demonstrates that his condition had not significantly improved since that date. This view is compounded by the more recent opinion of consultative examiner Dr. Reinhold, who found similarly marked and extreme limitations in Folks' ability to interact with others as well as his September 2020 suicide attempt.

Likewise, in discounting the opinion of examining source, Dr. Reinhardt, that Folks had marked limitations in interacting with others, the ALJ failed to mention that Folks was experiencing manic symptoms during their first meeting which required them to cut it short. Thus, the ALJ's characterization of Dr. Reinhold's opinion as inconsistent with his own examination ignores their first interview during

which he extremely anxious and had difficulty sitting still and reported that he would have to leave the interview if it were not over quickly, the fact that Dr. Reinhardt noted his limited impulse control and that his past employment "has been impaired by severe anxiety resulting in angry outbursts." (Tr. 775-76).

Finally, the ALJ's reliance upon the 2019 opinion of the non-examining source, Dr. Plowman, fails to take into account the fact that subsequent medical events, including Folks' September 2020 attempted suicide, cast significant doubt upon this benign outlier opinion. In this setting, when an ALJ's decision rests upon the opinions of state agency experts issued at the outset of the agency process without the benefit of consideration of later material developments:

> [C]ase law . . . cautions courts to take into account the fact that state agency non-treating and non-examining source opinions are often issued at an early stage of the administrative process. While this fact, standing alone, does not preclude consideration of the agency doctor's opinion, see Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011), it introduces another level of caution that should be applied when evaluating reliance upon such opinions to discount treating and examining source medical statements. Therefore, where a state agency non-treating and non-examining opinion does not take into account material medical developments which have occurred after the opinion was rendered, that opinion often cannot be relied upon by the Commissioner to carry its burden of proof. See Batdorf v. Colvin, 206 F. Supp. 3d 1012, 1023 (M.D. Pa. 2016).

Foose v. Berryhill, No. 3:17-CV-00099, 2018 WL 1141477, at *7 (M.D. Pa. Mar. 2, 2018). In a mental health assessment, it is difficult to imagine a more material

medical development than a subsequent suicide attempt. Therefore, the inability of Dr. Plowman to take this event into account when opining on Folks' limitations wholly undermines his opinion and compels a remand.

Simply put, the ALJ's attempt to characterize the record of Folks' mental health symptomology as benign and unremarkable fails when viewed against the full record of evidence that was disregarded without explanation by the ALJ. This cascade of errors committed by the ALJ resulted in an RFC assessment which significantly understates the severity of Folks' psychological impairments. Thus, while nothing in this Memorandum Opinion should be deemed as expressing a judgment on what the ultimate outcome of any reassessment of this evidence should be, this case should be remanded so the ALJ may make an assessment on Folks' case considering all the evidence in the record.

## IV.  <u>Conclusion</u>

Accordingly, for the foregoing reasons, the plaintiff's request for a new administrative hearing is GRANTED, the final decision of the Commissioner denying these claims is vacated, and this case is remanded to the Commissioner to conduct a new administrative hearing.

An appropriate order follows.

_s/ Martin C. Carlson_
Martin C. Carlson
United States Magistrate Judge

DATED: October 22, 2025